UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DAMARIO SAQUAN SKINNER,

    Defendant.

Case No. 18-20433
Honorable Laurie J. Michelson

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS [21]**

Damario Skinner was pulled over for failing to stop at a stop sign. A gun was found in his vehicle. As a result, Skinner was charged with being a felon in possession of a firearm. But Skinner contends he never consented to the search of his vehicle and so the gun must be suppressed. For the reasons set forth below, the motion to suppress will be denied.

**I.**

Michigan State Police troopers Michael Lopez and Justin Clarke were on their regular road patrol in the City of Flint on April 10, 2018. (ECF No. 24, PageID.59–60.) At around 7:00 p.m. they saw a car fail to come to a complete stop at a stop sign and initiated a routine traffic stop. (*Id.*, PageID.65, 109.) Clarke approached the driver's side and Lopez the passenger's side of the stopped vehicle. (*Id.*, PageID.67.) The driver was Damario Skinner. (*Id.*, PageID.110.) Clarke obtained Skinner's driver's license. (*Id.*, PageID.111.) Then, the troopers returned to their patrol car and initiated a criminal justice inquiry, which came back clear for any outstanding warrants. (*Id.*, PageID.68, 83, 113, 137.) Lopez thought Skinner seemed very nervous. So the troopers decided to ask him if they could search the vehicle. (*Id.*, PageID.68, 97.) Clarke went back to Skinner's vehicle while Lopez remained in the patrol car. (*Id.*, PageID.68.) After some discussion,

Skinner got out of the car and Clarke did a pat down. (*Id.*, PageID.94.) A short time later, Skinner fled. (*Id.*, PageID.69, 94.) The officers chased him down and brought him back to the patrol car in handcuffs. (*Id.*, PageID.69, 123.) Clarke then finished searching the car. (*Id.*, PageID.70, 124.)

The parties dispute what happened between the time Clarke went back to Skinner's car to seek his consent to search and the time Skinner took off running. And, unknown to the troopers at the time, the patrol car's audio system, including the microphone worn by Clarke, was not operational and did not capture the exchange between Clarke and Skinner. (*Id.*, PageID.72, 130, 156.)

According to Trooper Clarke, he was aware that he did not have probable cause to search Skinner's vehicle and, thus, needed Skinner's consent. (*Id.*, PageID.139.) Clarke says Skinner gave him verbal permission to search the car. (*Id.*, PageID.115, 143.) Clarke then asked Skinner to exit the vehicle, which he did. (*Id.*, PageID.116, 158, 182, Ex. 1.) This is consistent with Clarke's normal routine when consent is given. (*Id.*, PageID.166–167.) He did a pat-down of Skinner and then had him stand in front of the patrol car. This is corroborated by the video of the stop (it was only the audio that was not working). (*Id.*, PageID.119, Ex. 1.) A short time later, Lopez got out of the patrol car and stood next to Skinner. Clarke then searched the front of the vehicle. (*Id.*, PageID.120.) He says that while he was searching the car, Skinner did not ask him to stop. (*Id.*, PageID.116, 161.) Inside the center console ashtray, Clarke found a baggie of marijuana. (*Id.*) "And underneath the center console, the shifter of the vehicle, down near the pedals, there [was] a void, and in that void, [he] found a weapon." (*Id.*, PageID.120, Ex. 2.) As Clarke was removing the firearm, Skinner took off running. (*Id.*, PageID.122.)

For his part, Skinner recalls Trooper Clarke asking him if he had any marijuana or firearms for protection in the car. (*Id.*, PageID.176.) Clarke then asked Skinner to exit the vehicle. (*Id.*)

2

Skinned asked, "what for" and Clarke replied, "because I'm asking you to step out of the car." (*Id.*) Skinner does not "have any memory of being asked if [he] would give permission to search the vehicle." (*Id.*, PageID.176–177.) And while he says he was trying to understand why Clarke was searching the car, he did not ask Clarke to stop searching and did not tell him "I do not want you to search." (*Id.*, PageID.182–183, 186.) He also recalls Clarke saying "we got him" after finding the firearm, at which point Skinner ran. (*Id.*, PageID.177–178.)

After a short chase, Skinner was apprehended and arrested. (*Id.*, PageID.123-124.) The parties dispute whether Skinner agreed to waive his *Miranda* rights and speak to the officers. Ultimately, Skinner did not answer any questions about the offense.

Skinner was charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) A short time later, the parties entered into a stipulation for an evidentiary hearing to allow Skinner to challenge the search of the vehicle. (ECF No. 17.) The stipulation advised that Skinner "does not contest that probable cause existed for the traffic stop of his vehicle, as the traffic violation, failing to yield to a stop sign, was captured on the police in-car Video Recording System." (*Id.*) But Skinner "denie[d] that he freely, voluntarily and intelligently consented to a search of this vehicle and therefore the evidence seized should be suppressed." (*Id.*; ECF No. 21.)

The Court conducted an evidentiary hearing on April 24, 2019. The evidence consisted of witness testimony from Lopez, Clarke, and Skinner, a copy of the video recording of the traffic stop, and a photograph of the inside of Skinner's car where the gun was found. (ECF No. 24 and Exs. 1 and 2.) The parties also submitted post-hearing briefing. (ECF No. 25, 27.) The motion to suppress is ready for resolution without the need for further argument.

**II.**

The Fourth Amendment prohibits searches without a warrant except in limited circumstances, such as when the search is conducted with consent. *See United States v. Jenkins*, 92 F.3d 430, 435–436 (6th Cir. 1996) ("An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search."). "In order to justify a search by consent, the government must prove by 'clear and positive testimony' that the asserted consent was 'voluntary' and 'unequivocally, specifically, and intelligently given.'" *United States v. Buckingham*, 433 F.3d 508, 514 (6th Cir. 2006) (quoting *United States v. Worley*, 193 F.3d 380, 385–86 (6th Cir. 1999)). A person may express consent to a search "in the form of words, gesture, or conduct." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc). "Whether consent was free and voluntary . . . is 'a question of fact to be determined from the totality of all the circumstances.'" *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

**III.**

Considering the totality of the circumstances, the Court finds that the Government has satisfied its burden of establishing that Skinner consented to the search of his car.

**A.**

First, Clarke's account has some corroboration. Troopers Lopez and Clarke both testified that, because Skinner appeared nervous, they were going to seek his consent to search the car. Clarke was aware that he lacked probable cause to search and could only do so with consent. Clarke testified that Skinner verbally gave consent. The video of the stop corroborates that, after Clarke says he went back to Skinner's car to seek consent, Skinner voluntarily opened the door and exited the vehicle. Clarke testified that there would be "no other reason" for "Skinner to have exited the car other than . . . Clarke asking if he could search the car." (ECF No. 24, PageID.94.)

Skinner says that Clarke ordered him out of the car, but nothing in the video suggests any confrontation, lack of voluntariness, or resistance by Skinner. Indeed, Skinner did not object to the search.

Second, while Clarke testified unequivocally that Skinner consented to the search, Skinner did not testify unequivocally that he declined or refused to give consent. He testified on direct that he had no memory of being asked for permission to search the car. (ECF No. 24, PageID.176.) On cross, he said he repeatedly asked Lopez why Clarke was searching his car but acknowledged he never told Clarke to stop. Skinner said that after he got out of the car, Clarke just started to search without asking his permission. Then, he had the following exchange on redirect:

> Q. Well, [the prosecutor] asked you if you're familiar with the [criminal justice] system. Do you recall her asking you that?
>
> A. Yes.
>
> Q. Okay. And in your experience when you tell the police, "I don't want to do that," or "Don't do something," do they listen to you?
>
> A. Yes.
>
> Q. Okay. So you think the police would have stopped searching if you said, "Stop searching my vehicle?"
>
> A. See, I was still lost as to why they were searching the vehicle so I didn't know what to say because I never, like, did—I had just gotten my license in 2017.
>
> Q. Okay. Had they asked you to search the vehicle, what would you have said?
>
> A. I would have—I would have wanted know why they wanted to search the vehicle.
>
> Q. Okay.
>
> A. Like did they have any probable cause to search the vehicle.
>
> Q. But it's your testimony that they did or didn't ask you to search it?
>
> A. No. He just asked me—what, to me, in my phrase, he asked me trick questions.

5

Q. Okay. That doesn't answer my question. Did he ask you to search the vehicle or didn't he?

A. No.

(ECF No. 24, PageID.185–186.)

After the hearing, Skinner, on his own, sent the Court an undocketed letter to clarify some of his testimony. He wanted to further explain, albeit not under oath or subject to cross-examination, why he testified that he did not tell the officers to stop searching. He said he "wasn't under the impression that [he] gave Tpr. Clarke consent" and reiterated that he was "trying to figure out what was the reason for the search, so that [he] could know if [he] had the authority to tell the officer to stop searching." Again, nothing to suggest he definitively refused consent.

Considering all of the testimony and the videotape, the Court finds credible Clarke's testimony that he asked for consent to search and consent was given. And even if the Court also found credible that Skinner may have been confused as to why the trooper was searching his car, the same is not true of his testimony that Clarke simply searched without even asking for permission. Clarke had a microphone clipped to his belt. He did not know it was not working. There is nothing in the record to suggest the troopers tampered with the audio. The Court agrees with the Government that "[a]n officer is less likely to fabricate a story that defendant gave verbal consent to search his vehicle knowing that the encounter was being recorded." (ECF No. 27, PageID.221.) Nor is it implausible that Skinner would have given consent to search the car because there was a chance Clarke would not find the gun. It was hidden "pretty deep" in the console area. (ECF No. 24, PageID.122.) Skinner testified that "if they didn't think to look there, no, they wouldn't have found [the gun.]" (ECF No. 24, PageID.188.) And lastly, the Court cannot overlook that Skinner took off running because he had done "time with a gun before." (ECF No. 24, PageID.185.) That attempt to avoid charges did not work. But suppressing the gun would. So

Skinner does have the most to gain by a favorable ruling. And the only way to suppress the gun is to claim a lack of consent to search.

Skinner's challenges to Clarke's credibility do not persuade. First, Skinner says that "the Court has only Trp. Clark[e]'s testimony when making a determination if the government has shown that consent to search defendant's vehicle was unequivocal, specific and intelligently given" because Lopez testified that he could not hear what Clarke was saying to Skinner. (ECF No. 25, PageID.197.) This is true. And it is corroborated by the video which shows only Clarke returning to Skinner's vehicle after checking his license. That Lopez does not try to make this two against one, however, only bolsters the troopers' credibility.

Next, Skinner contends that Clarke testified in great detail about many aspects of the traffic stop but could not recall Skinner's exact words in giving consent. (ECF No. 25, PageID.197–202.) But again, that Trooper Clarke was able to recall many of the details of the traffic stop makes it more likely, not less, that he also correctly recalls Skinner giving consent. Although Clarke could not recall Skinner's exact words, that is not surprising given that he testified more than one year after the stop and had made more than 20 traffic stops that night. (ECF No. 24, PageID.134.)

Lastly, Skinner points to Clarke's testimony that Skinner waived his *Miranda* rights. Skinner says this is inaccurate and, thus, Clarke is not credible. (ECF No. 25, PageID.202–204.) After Skinner was arrested and placed in the back of the patrol vehicle, the troopers flipped the camera so that it would be facing into the car and the in-car audio began to work. (*Id.*, PageID.72, 151.) Trooper Clarke advised Skinner of his Miranda rights and asked Skinner if he wanted to waive those rights and answer questions. (*Id.*, Ex. 1.) Clarke's recollection is that Skinner agreed to talk. (*Id.*, PageID.152–153.) The recording is not entirely clear. Clarke's interpretation of the video is that Skinner responded "mm-hmm" when asked if he wanted to talk. (*Id.*, PageID.111–

12, Exhibit 1). So Clarke asked Skinner, "what did I find in the car?" and "why did you run." (ECF No. 24, ex. 1.) Skinner did not respond. Skinner told the troopers he would answer questions if he could make a phone call. (*Id.*, Ex. 1.) Clarke rejected that offer and did not question Skinner any further. The Government is correct to point out that the video reveals that the troopers "were mindful of defendant's constitutional rights and did not violate them." (ECF No. 27, PageID.226.) Thus, the Court has no reason to think the same is not true of the search of Skinner's car.

In sum, the Court credits Clarke's testimony that he sought and obtained consent to search Skinner's car. *See United States v. Thompson*, No. 16-6755, 2018 U.S. App. LEXIS 15549, at *2–4 (6th Cir. June 5, 2018) (affirming denial of suppression motion where district court explained that the officer who obtained consent provided credible testimony, the other officers were not close by when that officer obtained consent, and there was no evidence that defendant refused the request for consent); *United States v. Gaddie*, No. 07-cr-111, 2008 U.S. Dist. LEXIS 37135, at *10–11 (W.D. Ky. May 6, 2008) (denying motion to suppress where court found credible law enforcement agent's testimony that defendant gave verbal consent to search his vehicle, that defendant did not object at any point to the search, and that defendant's consent was knowing and voluntary).

**B.**

Skinner also argues that if he gave consent, it was not valid consent.

The Court disagrees. "In whatever form, consent has effect only if it is given freely and voluntarily." *Carter*, 378 F.3d at 587 (citing *Bumper v North Carolina*, 391 U.S. 543, 548 (1968)). As mentioned, this is not the first time Skinner has been involved in the criminal justice system. (ECF No. 24, PageID. 182.) He is familiar with how the system works. (ECF No. 24, PageID.185.) Combined with his intelligence, revealed in both his testimony and post-hearing letter, Skinner appears capable of understanding his rights. The testimony from all the witnesses was consistent

that the troopers did not raise their voices, use or threaten force, draw their guns, or restrain Skinner prior to his ultimate arrest. (ECF No. 24, at Page ID.87, 112, 117, 159.) Skinner did not ask or tell Clarke to stop the search. So the record supports that Skinner's consent was not the product of duress or coercion. *See United States v. Biles*, 100 F. App'x 484, 490 (6th Cir. 2004) (holding that defendant's consent during a short traffic stop was voluntary where defendant understood his rights and was not threatened or coerced).

**IV.**

For the foregoing reasons, Defendant's motion to suppress the firearm found during the search of his vehicle is DENIED.

SO ORDERED.

Dated: October 18, 2019

                                            s/Laurie J. Michelson
                                            LAURIE J. MICHELSON
                                            UNITED STATES DISTRICT JUDGE